UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ADAM JOSHUA MACKER,

      Plaintiff,

v.                                       Case No: 6:23-cv-1963-JSS-DCI

MESHELLE NAYLOR, JASON
STICKLES, MICHAEL CHITWOOD,
DEPUTY IGO, BRANDON KING,
and PERDUE, BRANDON,
FIELDER, COLLINS & MOTT, LLP,

      Defendants.

_____/

## ORDER

      After his amended complaint was dismissed, (Dkt. 126), Plaintiff, proceeding pro se, filed a second amended complaint, (Dkt. 130). Defendants move to dismiss the second amended complaint with prejudice for failure to state a claim and for noncompliance with the order dismissing the amended complaint. (Dkts. 132, 134.) They also move to stay this case pending resolution of their motions to dismiss. (Dkts. 138, 140.) Plaintiff opposes all of Defendants' motions. (Dkts. 135, 136, 142, 143.) Upon consideration, for the reasons outlined below, the court grants Defendants' motions to dismiss and denies their motions to stay as moot.

## FACTS[1]

      Plaintiff sues Perdue, Brandon, Fielder, Collins & Mott, LLP, and five employees of the Volusia Sheriff's Office: Deputy Meshelle Naylor, Sergeant Jason

---

[1] The court accepts the well-pleaded factual allegations contained in the second amended complaint as true and construes them in the light most favorable to Plaintiff. *See Harry v. Marchant*, 291 F.3d 767, 769 (11th Cir. 2002) (en banc).

Stickles, Sheriff Michael Chitwood, Deputy Igo, and Deputy Brandon King. (*See* Dkts. 130, 130-1.) As was the case with his initial and amended complaints, (*see* Dkts. 1, 84), Plaintiff's pleading again alleges disparate claims related to an ongoing conspiracy and includes factual allegations that do not directly pertain to the causes of action asserted against Defendants, (*see* Dkt. 130). The court disregards the extraneous allegations to focus on the details germane to the claims against Defendants. If the court were to do otherwise, the second amended complaint would amount to a shotgun pleading and would be subject to dismissal on that basis. (*See* Dkt. 126 at 18 n.2.) *See Barmapov v. Amuial*, 986 F.3d 1321, 1325 (11th Cir. 2021) (holding that a complaint was "undoubtedly" a shotgun pleading when it was "rife with immaterial factual allegations" and "include[d] numerous vague and conclusory allegations," and thus, discerning no abuse of discretion in the dismissal of the complaint).

Plaintiff calls Perdue a "[c]ollection [a]gency," (*id.* at 3), and alleges that Perdue, "working in conjunction with" the Volusia County Clerk's Office, has engaged in a pattern of "fraud and extortion" in "hundreds of cases" by "forcing double payments for [d]river's [l]icense reinstatement" and by "reporting false judgments to the credit bureaus," (*id.* at 18–19). The second amended complaint does not contain any information about how Perdue works in conjunction with the Volusia County Clerk's Office. (*See id. passim.*) Plaintiff further states—without elaboration—that Perdue "do[es] not treat all citizens in this manner." (*Id.* at 30.) As to Plaintiff in particular, the second amended complaint alleges that on August 23, 2021, his driver's license "was unlawfully suspended due to fraud executed by Perdue . . . working in

conjunction with" the Volusia County Clerk's Office.  (*Id.* at 10.)  Perdue purportedly double-charged him on court fines, extorted funds from him for driver's license reinstatement, and falsely reported judgments against him to credit bureaus, thereby "causing [him] significant financial injuries."  (*Id.* at 6; *accord id.* at 30.)

With respect to Deputy Naylor, Plaintiff describes an October 13, 2021 incident. (*Id.* at 11–14.)  On that date, he alleges, she "operat[ed] an unmarked vehicle at school release time" and "hid on a back road" while an all-points bulletin concerning his car was active.  (*Id.* at 11.)  According to Plaintiff, she turned on her lights and sirens "the moment she spotted" him.  (*Id.* at 14.)  She began to pursue him as he drove his daughter home from middle school, and because he was "unsure if [the person pursuing him] was a legitimate [p]olice [o]fficer," for safety reasons he drove "straight home while obeying all traffic laws[,] including the . . . speed limit," instead of stopping his car.  (*Id.* at 11.)  Deputy Naylor's department-issued recording device purportedly captured statements by her corroborating that Plaintiff obeyed the speed limit as he headed home.  (*Id.* at 11–12.)  Plaintiff states that when he arrived at his residence, Deputy Naylor "immediately drew her . . . firearm" on him and "ordered him to slowly exit his vehicle."  (*Id.* at 12.)  According to Plaintiff, although he posed "no immediate threat," Deputy Naylor held him "at gunpoint for approximately five minutes" as she interrogated him.  (*Id.* (emphasis omitted).)  Plaintiff claims that she "was aware" that he "did not pose any immediate threat."  (*Id.* at 24; *accord id.* at 25 ("[I]t was blatantly obvious [that] Plaintiff was not a threat whatsoever." (emphasis omitted)).)

- 3 -

Within five minutes, Plaintiff alleges, Sergeant Stickles and three other officers arrived on the scene. (*Id.* at 12.) Plaintiff states: "Without ever reading [him] his *Miranda*[2] rights[,] Deputy Naylor continued to question" him while Sergeant Stickles approached. (*Id.* (cleaned up).) According to Plaintiff, Sergeant Stickles "made seven unconscious body gestures in accordance with" charges to be brought against Plaintiff, and Deputy Naylor's recording device captured these gestures. (*Id.*) Plaintiff alleges that when Deputy Naylor asked him why he did not stop the car for her, he explained that "he was scared she was not a legitimate [p]olice [o]fficer" because her "car was unmarked." (*Id.*) In response, Sergeant Stickles allegedly said, "[T]hat's the stupidest thing I've ever heard," and ordered the other officers to apprehend Plaintiff. (*Id.*) Sergeant Stickles also allegedly "attempted to permanently confiscate" Plaintiff's car but was prevented from doing so by a superior officer because of a dent in the car. (*Id.*)

According to Plaintiff, Deputy Naylor was then "invited inside . . . Plaintiff's residence by . . . [his] father . . . to discuss the issues at hand concerning . . . Plaintiff in front of [Plaintiff's fourteen-year-old] daughter." (*Id.* at 13.) Plaintiff complains of comments that Deputy Naylor made to his daughter about how his drug use caused him to suffer from mental illness and to "dive into religion"—"a common theme" for individuals like him. (*Id.*) Plaintiff claims that these comments have "had a prolonged negative effect on [his] relationship with his now seventeen-year-old gifted child" because they "deceptively assisted in the child's lack of faith in God." (*Id.* at 25 (emphasis omitted).) Purportedly, Deputy Naylor also asked Plaintiff's daughter if he

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

had been diagnosed with a health condition and, while Deputy Naylor escorted her
and Plaintiff's father to a police vehicle, asked her if Plaintiff had given her anything
illegal. (*Id.* at 13.) Plaintiff states that "Deputy Naylor transported [him] to Volusia
County Jail" on charges of "fleeing and child neglect" and filed an incident report
making "no assertion" about an ongoing investigation into him or about the all-points
bulletin on his car. (*Id.* at 14.) He claims that although Deputy Naylor alleged that
she ran a search on his license plate before she initiated the traffic stop, this allegation
was false because the fact that she initiated the stop as soon as she saw him meant that
she did not have enough time to run such a search. (*Id.*)

In addition to alleging Sergeant Stickles's involvement in the October 13, 2021
incident, Plaintiff claims that Sergeant Stickles "refused to be of any assistance" and
did "not allow[] any reports to be filed" when Plaintiff called two officers to his
residence in early August 2022 to report credit card fraud, identity theft, gang stalking,
two attempts on his life, and the theft of his motorcycle. (*Id.* at 16.) As to the theft of
the motorcycle, Sergeant Stickles purportedly "mock[ed]" Plaintiff by asking him,
"[H]ow stupid can you be?" because Plaintiff let someone with "an alleged drug
problem . . . perform repairs on the motorcycle." (*Id.* at 16–17.) Plaintiff refers to
Sergeant Stickles in conclusory terms as "a primary orchestrator" of the acts against
Plaintiff and his family alleged in the second amended complaint. (*Id.* at 33.) Plaintiff
further states that both Sergeant Stickles and Sheriff Chitwood "repeatedly ignored a
pattern of criminal violations perpetrated against" him and disregarded him "when
[he] desperately reached out for assistance." (*Id.* at 29.) Allegedly, they also "did

nothing to rectify" Plaintiff's unwarranted placement on a list of terrorists even though
they knew that he was not a national security threat. (*Id.*)

Regarding Sheriff Chitwood, Plaintiff adds that although Plaintiff emailed him
"many times" from early June through November 2022 and "fully articulat[ed] all the
criminal actions perpetrated against Plaintiff desperately asking for assistance," Sheriff
Chitwood "completely ignored" the emails and did not send "a single reply." (*Id.* at
16.) Plaintiff also describes a February 20, 2023 encounter he had with Sheriff
Chitwood at the Volusia Sheriff's Office. (*Id.* at 20–21.) Plaintiff asserts that while he
was turning in his fourth complaint (of five, *see id.* at 17, 20–21) to the Internal Affairs
division, he "stumbled upon news crews . . . waiting to interview Sheriff Chitwood."
(*Id.* at 20.) According to Plaintiff, he sought and obtained permission from a camera
operator to stay for the interview. (*Id.*) Purportedly, when Sheriff Chitwood arrived,
he "knew exactly who . . . Plaintiff was[,] look[ed] directly into [his] eyes with
dominance in a clear effort to intimidate," asked him what he was doing there, and
after "Plaintiff explained that he was given permission to observe[,] . . . refused to
converse with [him] any further." (*Id.* at 20–21.)

With respect to Deputies Igo and King, Plaintiff claims that the former was
involved in two incidents—on March 19 and April 6, 2023—and the latter was
involved in the April 6 incident. (*Id.* at 21–23.) As for the first incident, Plaintiff relates
that on March 19, his stolen motorcycle was returned to him at his residence and the
authorities were accordingly told to withdraw the all-points bulletin on the motorcycle.
(*Id.* at 21.) Nonetheless, Plaintiff claims, Deputy Igo and another officer arrived at his

residence, "refus[ed] to withdraw" the all-points bulletin, and "demand[ed] engagement with . . . Plaintiff." (*Id.*) Plaintiff states that he "declined to engage" with the officers because they were "intent on framing [him] with . . . fabricated charges, claiming [that] the [m]otorcycle was falsely reported stolen." (*Id.* at 21–22.) For seventy-five minutes, Plaintiff alleges, the officers "attempt[ed] to apprehend him on his property," causing him to "lock[] himself in his residence" and to call 9-1-1 approximately six times while his daughter "cr[ied] frantically." (*Id.*) According to Plaintiff, the Volusia Sheriff's Office impounded the motorcycle and arrested the individual who had returned it to Plaintiff for dealing in stolen property. (*Id.*) Plaintiff asserts that Deputy Igo acted as he did because he knew that Plaintiff had been "falsely placed on a terrorist list[] and it would be nearly impossible for . . . Plaintiff to seek legal recourse" and because "many officers cited are raci[]st" and Plaintiff is "half Jewish on his mother's side." (*Id.* at 26–27.)

As for the second incident, around 12:30 AM on April 6, 2023, while Plaintiff was "at home in bed with his children," Deputies Igo and King and another deputy purportedly "gained access to . . . Plaintiff's 1.5-acre lot" by "disabl[ing] a gate." (*Id.* at 22–23, 28.) Plaintiff alleges that although a warrant to arrest him for his failure to appear in two cases "had already been signed," the deputies did not have a search warrant "for the residence or property." (*Id.* at 22–23, 27.) According to Plaintiff, the deputies "bang[ed] on doors and windows for nearly [ten] minutes," shined flashlights, and called for him to come outside. (*Id.* at 23.) Plaintiff allegedly responded by threatening to call 9-1-1 to report the deputies' harassment of him. (*Id.*) Plaintiff states:

"With two minors in the home crying frantically, [and the deputies'] weapons drawn [and] aimed directly at [him, the deputies] busted a dead[]bolt out of a solid wooden door[ and] . . . stormed and tackled [him] . . . [thirty-five] feet into his own home on a school night for the children." (*Id.*) After Plaintiff was down on the ground, he claims, Deputy Igo kept pressing a knee against his back "for no apparent reason other than to inflict more unnecessary pain." (*Id.*) Allegedly, after Plaintiff was "completely subdued and in hand[]cuffs," Deputy Igo told him that they were going to get him the help he needed. (*Id.*) Plaintiff reports that in connection with this incident, he was charged with resisting arrest without violence and was transported to the Volusia County Jail without bond. (*Id.*)

## PROCEDURAL HISTORY

Plaintiff initiated this case by filing a complaint against Defendants, as well as other parties who have since been terminated from this case. (*See* Dkt. 1.) The initial complaint asserted claims under criminal statutes and 42 U.S.C. § 1983. (*See* Dkt. 1.) Defendants moved to dismiss the claims against them. (Dkts. 44, 45.) The Volusia Sheriff's Office Defendants mainly argued that the initial complaint was so unclear as to constitute a shotgun pleading; however, they also maintained that it failed to state a plausible claim for relief. (Dkt. 44 at 2–8.) They sought dismissal with prejudice of the claims brought under the criminal statutes, and they contended that Plaintiff's factual allegations did not sufficiently support the constitutional violations for his section 1983 claims. (*Id.* at 4–8.) Perdue shared the view that the complaint was a shotgun pleading, (Dkt. 45 at 2, 11–12), and went further, stating that the claims were

so frivolous as to warrant dismissal for lack of subject matter jurisdiction, (*id.* at 7–11).

Alternatively, Perdue asserted that Plaintiff failed to state a claim against it under

section 1983 because he did not allege any of the three categories under *Rayburn v.*

*Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001), for establishing a private party like

Perdue as a state actor liable under the statute.  (Dkt. 45 at 9–13.)

The magistrate judge assigned to this case recommended that the claims under

the criminal statutes be dismissed with prejudice given the futility of amendment and

that the section 1983 claims be dismissed without prejudice on shotgun pleading

grounds.  (Dkt. 55.)  Given the lack of clarity in the complaint, the magistrate judge

could not tell what section 1983 claims were brought against whom or on what bases

and thus did not go into detail about the purported constitutional violations.  (*See, e.g.*,

*id.* at 7 ("Throughout the pleading, Plaintiff vaguely discusses . . . Defendants'

involvement in conspiracies that are intertwined in the violation of his civil rights[,]

and it is unclear . . . who Plaintiff brings the remaining [section 1983] claim(s)

against.").)  In discussing the section 1983 claim against Perdue, the magistrate judge

noted that the shotgun nature of the pleading precluded determining which of the three

*Rayburn* categories, if any, applied.  (*Id.* n.3.)  The court adopted the recommendation

and ordered Plaintiff to file an amended complaint that "correct[ed] the deficiencies

explained" therein.  (Dkt. 79 at 3–4.)

Plaintiff filed an amended complaint, again bringing claims against Defendants

under criminal statutes and section 1983 and adding a civil RICO[3] claim against

---

[3] Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968.

Perdue. (Dkt. 84.) Defendants moved to dismiss making largely the same arguments
as before. (*Compare* Dkts. 87, 89, *with* Dkts. 44, 45.) With respect to the section 1983
claims, the Volusia Sheriff's Office Defendants asserted that Plaintiff insufficiently
alleged constitutional violations, (Dkt. 87 at 6–12), and Perdue maintained that he
failed to plead state action under *Rayburn*, (Dkt. 89 at 8–11). The court agreed with
Defendants on these points. (Dkt. 126 at 26–38.) For the constitutional violations
alleged in the amended complaint against the Volusia Sheriff's Office Defendants, the
court explained that Plaintiff's allegations were insufficient to state plausible claims for
relief. (*Id.* at 30–38.) As to Perdue, the court discussed the three *Rayburn* categories
for state action and explained that the amended complaint did not adequately allege
any of them. (*Id.* at 27–29.) The court allowed Plaintiff to file a second amended
complaint to "add information in support of—and remove information unrelated to—
his . . . claims against . . . Defendants in the amended complaint" and gave him
specific directives to follow if he chose to do so. (*Id.* at 41–42.)

The court required Plaintiff to "correct[] the pleading deficiencies identified in
th[e] order" dismissing the amended complaint, and it prohibited him from asserting
in the second amended complaint any claims not asserted in the amended complaint
"unless he first satisfie[d] Federal Rule of Civil Procedure 16(b)(4) by demonstrating
'good cause' and obtaining 'the [court]'s consent.'" (Dkt. 126 at 41 (quoting Fed. R.
Civ. P. 16(b)(4)).) The court ordered Plaintiff to "eliminate from his second amended
complaint all details unrelated to the claims . . . in the second amended complaint"
and to "add details only as necessary to correct the pleading deficiencies identified in

th[e] order and otherwise state claims for relief." (*Id.*) Regarding section 1983 claims, the court stated: "For each section 1983 claim asserted in the second amended complaint, Plaintiff shall identify the constitutional right he alleges was violated and shall tailor his allegations to the elements of the cause of action associated with that right." (*Id.* at 42.)  The court also cautioned Plaintiff: "If the second amended complaint brings a claim without correcting all pleading deficiencies identified in this order related to that claim or if the second amended complaint fails to comply with any of these directives, the court may dismiss the second amended complaint without notice to Plaintiff." (*Id.*)

Plaintiff filed a second amended complaint bringing only section 1983 claims against Defendants. (*See* Dkt. 130 at 24–30; *see also* Dkt. 130-1 (the civil cover sheet attached to the second amended complaint, which identifies section 1983 as the only United States civil statute under which that complaint was filed).)  Plaintiff filed no attachments to the second amended complaint other than a civil cover sheet. (*See* Dkts. 130, 130-1.)  Against Deputy Naylor, Plaintiff alleges violations of the Fourth Amendment (unreasonable search and seizure and excessive force), Fifth Amendment (self-incrimination), and Fourteenth Amendment (substantive due process right to familial association). (Dkt. 130 at 24–26.)  He sues Sergeant Stickles and Sheriff Chitwood for violations of the Eighth Amendment (cruel and unusual punishment) and Fourteenth Amendment (equal protection). (*Id.* at 28–29.)  He alleges violations of the Fourth Amendment (unreasonable search and seizure) and Fourteenth Amendment (equal protection) against Deputy Igo. (*Id.* at 26–28.)  Against Deputy

King, he asserts a violation of the Fourth Amendment (unreasonable search and
seizure).  (*Id.* at 27–28.)  He sues Perdue for violations of the Fourteenth Amendment
(due process and equal protection).  (*Id.* at 29–30.)

## APPLICABLE STANDARDS

Although the court "give[s] liberal construction" to documents filed by pro se
plaintiffs, *Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007), the leniency afforded
to such plaintiffs "does not give [the] court license to serve as de facto counsel for
[them] or to rewrite an otherwise deficient pleading in order to sustain an action," *GJR
Invs., Inc. v. County of Escambia*, 132 F.3d 1359, 1369 (11th Cir. 1998) (emphasis and
citations omitted), *overruled on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662 (2009).
Moreover, pro se plaintiffs are still "required . . . to conform to procedural rules."
*Loren v. Sasser*, 309 F.3d 1296, 1304 (11th Cir. 2002); *see Cummings v. Dep't of Corr.*, 757
F.3d 1228, 1234 n.10 (11th Cir. 2014) ("The right of self-representation does not
exempt a party from compliance with relevant rules of procedural and substantive
law." (quoting *Birl v. Estelle*, 660 F.2d 592, 593 (5th Cir. 1981))).  One such procedural
rule—Federal Rule of Civil Procedure 8(a)(2)—requires a complaint to "contain . . . a
short and plain statement of [a] claim showing that the [plaintiff] is entitled to relief."
Fed. R. Civ. P. 8(a)(2).

In deciding a motion to dismiss for failure to state a claim, the court "accept[s]
the allegations in the complaint as true and construe[s] them in the light most favorable
to the plaintiff."  *Henley v. Payne*, 945 F.3d 1320, 1326 (11th Cir. 2019).  The court
"limits its consideration to" the operative complaint and any exhibits attached to that

complaint, *GSW, Inc. v. Long County*, 999 F.2d 1508, 1510 (11th Cir. 1993) (citing Fed. R. Civ. P. 10(c)), and "a plaintiff cannot amend [the] complaint through a response to a motion to dismiss," *Gause v. Med. Bus. Consultants, Inc.*, 424 F. Supp. 3d 1175, 1201 (M.D. Fla. 2019). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[D]etailed factual allegations" are generally not required, but "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

A federal court "possess[es] an inherent power to" ensure that the parties before it "comply with a court order." *Foudy v. Indian River Cnty. Sheriff's Off.*, 845 F.3d 1117, 1126 (11th Cir. 2017). "A federal court has at its disposal an array of means to enforce its orders, including dismissal in an appropriate case." *Id.* (quoting *Degen v. United States*, 517 U.S. 820, 827 (1996)).

## ANALYSIS

The court first explains why the section 1983 counts against Deputy Naylor, Sergeant Stickles and Sheriff Chitwood, Deputies Igo and King, and Perdue are due to be dismissed for failure to state plausible claims for relief. The court then explains why dismissal with prejudice is warranted.

### 1. Deputy Naylor

Plaintiff brings three counts against Deputy Naylor: unreasonable search and seizure and excessive force in violation of the Fourth Amendment (count one), infringement of the substantive due process right to familial association in violation of the Fourteenth Amendment (count two), and self-incrimination in violation of the Fifth Amendment (count three).  (Dkt. 130 at 24–26.)

### a. Unreasonable Search and Seizure and Excessive Force

In count one, Plaintiff alleges that Deputy Naylor violated his Fourth Amendment rights against unreasonable search and seizure and excessive force when she "fabricat[ed] the charge of child neglect" against him "without any proof" and "question[ed] [him] at gunpoint" for a period of "approximately five minutes." (*Id.* at 12, 24–25.)  To the extent that Plaintiff brings a claim against Deputy Naylor based on unreasonable search, the claim fails because Plaintiff does not describe a search involving this Defendant. (*See id. passim*.)

As to unreasonable seizure and specifically false arrest, although a "warrantless arrest without probable cause violates the Constitution," the "existence of probable cause . . . is an absolute bar to a section 1983 action."  *Marx v. Gumbinner*, 905 F.2d 1503, 1505–06 (11th Cir. 1990).  "Probable cause exists where 'the facts and circumstances within [an officer's] knowledge and of which [the officer] had reasonably trustworthy information are sufficient in themselves to warrant a [person] of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949) (alteration adopted) (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)).  "Probable cause for an arrest may

be found if there is probable cause to believe any crime was committed, whether or not there is probable cause for the crime the arresting officer actually believed had been committed." *Manners v. Cannella*, 891 F.3d 959, 969 (11th Cir. 2018). "[T]here is probable cause for a warrantless custodial arrest even for a seemingly insignificant crime." *Id.*

Here, the court agrees with Deputy Naylor, (*see* Dkt. 134 at 5), that according to the second amended complaint, she attempted a traffic stop of Plaintiff's car by turning on her lights and sirens in light of the all-points bulletin, and Plaintiff refused to stop for her. *See United States v. Webster*, 314 F. App'x 226, 228–29 (11th Cir. 2008) ("[P]olice officers may conduct warrantless investigatory searches without violating the Fourth Amendment where there is a reasonable suspicion of criminal wrongdoing. . . . In forming reasonable suspicion, an officer may rely on information provided by a police bulletin . . . ."). Florida law makes it a felony "for the operator of any vehicle, having knowledge that he or she has been ordered to stop such vehicle by a duly authorized law enforcement officer, willfully to refuse or fail to stop the vehicle in compliance with such order." Fla. Stat. § 316.1935(1). "A driver is required to stop regardless of the lawfulness of the police decision to direct the vehicle to stop." *DeRosa v. Rambosk*, 732 F. Supp. 2d 1285, 1295 (M.D. Fla. 2010) (citing *State v. McCune*, 772 So. 2d 596 (Fla. Dist. Ct. App. 2000)). Because Plaintiff admittedly did not stop for Deputy Naylor when she turned on her lights and sirens, (Dkt. 130 at 11), she had probable cause to arrest him. *See Walker v. City of Riviera Beach*, 212 F. App'x 835, 836 & n.1 (11th Cir. 2006) (noting that "probable cause was established" for a

violation of section 316.1935 "when [the section 1983 plaintiff] did not stop" after an officer in an "unmarked police car . . . pulled behind [him] and turned on [the car's] blue flashing lights to pull [him] over"); *Diaz v. State*, 548 So. 2d 843, 844 (Fla. Dist. Ct. App. 1989) ("Two detectives . . . in an unmarked car . . . activated their blue emergency lights . . . to stop [a criminal defendant]. . . . [O]nce [they] had [done so], [the defendant] was obliged to stop.  His failure to [stop] violated section 316.1935 . . . .").  The existence of probable cause for Plaintiff's arrest bars his claim for unreasonable seizure based on the arrest.  *See Marx*, 905 F.2d at 1505–06.

As to excessive force, the court explained in a prior order that Plaintiff "fails to state an excessive force claim against Deputy Naylor because a police officer's display of a firearm in the line of duty typically does not amount to constitutionally excessive force."  (Dkt. 126 at 36.)  *See Courson v. McMillian*, 939 F.2d 1479, 1495 n.26 (11th 1991) (observing that when "distinguish[ing] between the use or the attempted use of a weapon and mere display by an officer in the line of duty," the Fifth Circuit "was unwilling to find that the display of weapons, 'that only conditionally threatens actual force,' was excessive force . . . for an officer executing his responsibilities" (quoting *Hinojosa v. Terrell*, 834 F.2d 1223, 1231 (5th Cir. 1988))); *Jones v. Walsh*, 711 F. App'x 504, 507 (11th Cir. 2017) ("Officers are permitted to draw weapons when approaching and holding individuals for an investigatory stop when reasonably necessary for protecting an officer or maintaining order." (alteration adopted) (quotation omitted)); *Trucks v. City of Oneonta*, No. 2:22-CV-01414-RDP, 2023 WL 4216967, at *5, 2023 U.S. Dist. LEXIS 110524, at *14 (N.D. Ala. June 27, 2023) (holding that an officer "did

not engage in excessive force by drawing his firearm and ordering [the p]laintiff to the ground").

### b. Substantive Due Process Right to Familial Association

In count two, Plaintiff alleges that Deputy Naylor engaged in conscience-shocking misconduct in violation of his substantive due process right to familial association. (Dkt. 130 at 25.) Specifically, he claims that during the incident involving his refusal to stop his car, Deputy Naylor told his minor daughter that his religious convictions resulted from mental illness and drug use. (*Id.*) "[W]hen a plaintiff alleges violations of [his] fundamental parental rights, executive action must 'shock the conscience' to violate due process." *Littlejohn v. Sch. Bd. of Leon Cnty.*, 132 F.4th 1232, 1243 (11th Cir. 2025) (citing *Maddox v. Stephens*, 727 F.3d 1109, 1119 (11th Cir. 2013)). "'[O]nly the most egregious conduct' meets th[e conscience-shocking] standard." *Id.* (quoting *Waldman v. Ala. Prison Comm'r*, 871 F.3d 1283, 1292 (11th Cir. 2017)). "Even intentional wrongs seldom violate" substantive due process. *Maddox*, 727 F.3d at 1119; *see County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998) ("[T]he due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm.").

"[W]hether government action 'shocks the conscience' depends on context." *Littlejohn*, 132 F.4th at 1245. "Violations of the right to family association are determined by a balancing of competing interests." *Foy v. Holston*, 94 F.3d 1528, 1537 (11th Cir. 1996). However, "even the most severe infringement of parental liberties— intentionally depriving a parent of custody over [his] child—is not, by itself, conduct

that is clearly conscience-shocking." *Littlejohn v. Sch. Bd. of Leon Cnty. Fla.*, 647 F. Supp. 3d 1271, 1279 (N.D. Fla. 2022). Here, while investigating Plaintiff, Deputy Naylor purportedly made a few inappropriate comments to his fourteen-year-old daughter. (Dkt. 130 at 13; *see also* Dkt. 136 at 12.) This conduct does not shock the conscience. *See Pittsley v. Warish*, 927 F.2d 3, 7 (1st Cir. 1991) ("The plaintiffs contend[] that in light of the vulnerability of young children, the officer's statement that the children[, a four-year-old boy and ten-year-old girl,] would never see [their father figure] again, and the[] refusal to allow the children to 'hug and kiss' [the father figure] goodbye at the time of his arrest was so brutal, offensive[,] and intimidating as to 'shock the conscience.' The children's alleged fear or trauma which resulted from these spoken words and actions in this instance, however, is not sufficient to . . . 'shock the conscience.'"), *abrogated on other grounds by Sacramento*, 523 U.S. 833. Plaintiff's substantive due process claim against Deputy Naylor consequently fails.

### c. Self-Incrimination

In count three, Plaintiff alleges that Deputy Naylor violated his Fifth Amendment privilege against self-incrimination by "attempting to coerce evidence [against him] from [his] family members." (Dkt. 130 at 26.) However, the privilege at issue "protects a person only against being incriminated by *his own* compelled testimonial communications." *Fisher v. United States*, 425 U.S. 391, 409 (1976) (emphasis added). It is "a *personal* privilege" and "necessarily does not proscribe incriminating statements elicited from another." *Couch v. United States*, 409 U.S. 322, 328 (1973); *see Yowell v. Withrow*, No. 88–1586, 1989 WL 94557, at *2, 1989 U.S. App.

LEXIS 12401, at *6 (6th Cir. Aug. 18, 1989) ("[The petitioner] has no constitutional right not to be incriminated by [the witness's] testimony and may not assert [the witness's] [F]ifth [A]mendment privilege against self[-]incrimination on [the petitioner's own] behalf."). Count three thus fails to state a claim.

In light of the above, the court dismisses the claims against Deputy Naylor.

## 2. Sergeant Stickles and Sheriff Chitwood

Plaintiff asserts claims against Sergeant Stickles and Sheriff Chitwood based on his Fourteenth Amendment right to equal protection and Eighth Amendment guarantee against cruel and unusual punishment. (Dkt. 130 at 28–29.) According to the second amended complaint, these Defendants violated equal protection when they "repeatedly ignored a pattern of criminal violations perpetrated against" Plaintiff that "result[ed] in disparate treatment compared to others in similar situations" and, relatedly, when they disregarded Plaintiff's requests for help. (*Id.*) Further, they allegedly subjected Plaintiff to cruel and unusual punishment when they failed to correct his unwarranted placement on a list of terrorists. (*Id.* at 29.)

In the order dismissing the amended complaint, the court pointed out the deficiencies in Plaintiff's equal protection allegations:

> The amended complaint does not make clear whether it asserts Plaintiff's membership in a constitutionally protected class or brings a class of one claim. It also does not describe the pertinent class, identify the comparators for Plaintiff, discuss factors relevant to an objectively reasonable governmental decisionmaker, explain how Plaintiff and his comparators are similarly situated in light of such factors, or illustrate how Plaintiff was treated differently from his comparators. Accordingly, the amended complaint fails to state an equal protection claim.

(Dkt. 126 at 38 (citations omitted).) As Sergeant Stickles and Sheriff Chitwood

contend, (Dkt. 134 at 16), the same deficiencies inhere in the equal protection claims

against them in the second amended complaint, (*see* Dkt. 130 at 28–29).  Likewise,

with regard to Plaintiff's cruel and unusual punishment allegations, the court

previously explained:

> A typical section 1983 claim concerning the Eighth Amendment's
> prohibition against cruel and unusual punishment involves conduct by
> prison officials or inside prisons.  This is because the state does not
> acquire the power to punish with which the Eighth Amendment is
> concerned until after it has secured a formal adjudication of guilt in
> accordance with due process of law.  Although the amended complaint
> describes Plaintiff as falsely convicted of crimes, it does not show that
> Plaintiff was a prisoner within the meaning of the Eighth Amendment
> during the encounters when Plaintiff was subjected to the allegedly cruel
> and unusual punishment, nor does it explain how the Eighth
> Amendment is otherwise implicated in the claims for cruel and unusual
> punishment.  Accordingly, the amended complaint fails to state such a
> claim.

(Dkt. 126 at 30–31 (citations and quotation omitted and alteration adopted).)  The

second amended complaint does not correct this deficiency.  For these reasons,

Plaintiff fails to state plausible claims for relief against Sergeant Stickles and Sheriff

Chitwood.

### 3.  Deputies Igo and King

According to the second amended complaint, Deputy Igo violated Plaintiff's

equal protection rights[4] by refusing to withdraw the all-points bulletin on Plaintiff's

stolen motorcycle after the motorcycle was returned to Plaintiff and by arresting the

---

[4] Deputy Igo states that here and elsewhere in the second amended complaint, Plaintiff "attempt[s] to
invoke the constitutional rights of third parties" rather than his own rights. (Dkt. 134 at 13.)  However,
the court does not read the operative pleading as invoking any rights other than those belonging to
Plaintiff.  (*See* Dkt. 130.)

individual who returned it in connection with the theft. (Dkt. 130 at 21–22, 26–27.) Plaintiff generally complains that Deputy Igo did so because Plaintiff's false placement on a list of terrorists made it "nearly impossible for . . . Plaintiff to seek legal recourse" and because many of the Volusia Sheriff's Office Defendants are racist against Plaintiff given that he is "half Jewish on his mother's side." (*Id.*) Deputies Igo and King also allegedly violated Plaintiff's rights against unreasonable search and seizure by entering his residence to arrest him when they had an arrest warrant based on his failure to appear in court but did not have a search warrant for his property. (*Id.* at 27–28.) Plaintiff states: "Simply having an arrest warrant for someone inside does not automatically allow entry onto [the person's] property and especially forceful entry of [the person's] home without a search warrant for the property itself." (*Id.* at 27.) In addition, Plaintiff conclusorily calls the arrest warrant "falsely conjured" and appears to blame his defense counsel—as opposed to the deputies—for his failure to appear. (*Id.* at 22, 27.)

Like the amended complaint, the second amended complaint does not clarify the theory under which the equal protection claim proceeds. Does Plaintiff assert a class of one claim or base his protected class on his Jewish heritage?[5] In the former case, Plaintiff must show that he and his comparators are "similarly situated in light of all the factors that would be relevant to an objectively reasonable governmental

---

[5] Although Plaintiff's response to Perdue's motion suggests the latter, (Dkt. 135 at 9), Plaintiff "may not amend his [c]omplaint in a response to a motion to dismiss," *Hoever v. Whitehead*, No. 3:23-cv-245-MMH-LLL, 2024 WL 3161822, at *3 n.3, 2024 U.S. Dist. LEXIS 111213, at *8 n.3 (M.D. Fla. June 25, 2024).

decisionmaker." *Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1233 (11th Cir. 2022) (quotations omitted). In the latter case, Plaintiff must still "demonstrate that . . . he is similarly situated with other [persons] who received more favorable treatment" than he did. *Mohit v. West*, No. 21-12483, 2023 WL 239992, at *4, 2023 U.S. App. LEXIS 1112, at *11 (11th Cir. Jan. 18, 2023) (quoting *Jones v. Ray*, 279 F.3d 944, 946–47 (11th Cir. 2001)). Plaintiff alleges no comparators similarly situated to him; instead, he rhetorically supposes: "Your Honor, if your property had been returned, I can guarantee Deputy Igo would not have acted in the same manner." (Dkt. 130 at 27.) Such pure speculation does not suffice to state a claim. *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]").

As to the unreasonable search and seizure claims against Deputies Igo and King, Plaintiff is simply incorrect about the law. An "arrest warrant, standing alone, . . . give[s] deputies the authority to enter [a] home" to make an arrest. *United States v. Yeary*, 740 F.3d 569, 580 (11th Cir. 2014) (citing *Payton v. New York*, 445 U.S. 573, 603 (1980), and *United States v. Bennett*, 555 F.3d 962, 965 (11th Cir. 2009)). As far as these claims are concerned, Plaintiff does not levy any allegations against Deputies Igo and King about the "falsely conjured" nature of the arrest warrant or otherwise charge the deputies with any misconduct other than that they entered his home without a search warrant to execute the arrest warrant. (*See* Dkt. 130 at 27–28.) Because the arrest warrant permitted Deputies Igo and King to enter Plaintiff's home to arrest him, the unreasonable search and seizure claims are due to be dismissed.

### 4. Perdue

In the order dismissing the amended complaint, the court explained to Plaintiff that private parties like Perdue are rarely state actors for purposes of section 1983 liability. (Dkt. 126 at 27 (citing *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992)).) The court described the three categories for holding a private party liable under section 1983: compulsion by the government, performance of a traditional public function, and joint participation with the government. (*Id.* (citing *Rayburn*, 241 F.3d 1341).) The court concluded that the amended complaint did not satisfy the requirements for any of these categories. (*Id.* at 27–29.) The allegations portrayed the government not as coercing Perdue but as acquiescing to Perdue, described Perdue as performing the function of a collection agency (a function not traditionally the exclusive role of the government), and insufficiently supported with conclusory statements that Perdue and the government were intertwined in a symbiotic relationship involving the specific conduct of which Plaintiff complained. (*Id.*) Although the court "allow[ed] Plaintiff to file a second amended complaint that correct[ed] the deficiencies identified in th[e] order," (*id.* at 39; *accord id.* at 41 (permitting Plaintiff to bring section 1983 claims against Perdue in a second amended complaint "if he c[ould] do so in good faith after he correct[ed] the pleading deficiencies identified in th[e] order")), the second amended complaint does not correct the deficiencies related to state action for Perdue, (*see* Dkt. 130). Accordingly, the court dismisses Plaintiff's section 1983 claims against Perdue.

The court would reach the same outcome even if Plaintiff properly pleaded state

action.  The second amended complaint alleges that Perdue violated Plaintiff's due process and equal protection rights.  (*Id.* at 29–30.)  However, as before, the pleading does not "clarify whether the violations concern substantive or procedural due process," "clearly connect a fundamental right with a due process claim," or "plainly indicate the liberty or property interest (or interests) that Plaintiff seeks to vindicate, the process that he was (or was not) afforded regarding the interest, when the process occurred relative to the deprivation of the interest, or why the process was constitutionally inadequate."  (Dkt. 126 at 31–33.)  Regarding equal protection, Plaintiff states that Perdue "do[es] not treat all citizens" as it has treated him with respect to "double[-]charging on fines" and "forcing repayment for [d]river[']s [l]icense reinstatement," (Dkt. 130 at 30), but Plaintiff again alleges no comparators similarly situated to him, (*see id.*).  See *Mohit*, 2023 WL 239992, at *4, 2023 U.S. App. LEXIS 1112, at *11.  These reasons also support dismissal.

### 5. Prejudice

"A district court need not . . . allow an amendment . . . where there has been . . . bad faith . . . or repeated failure to cure deficiencies by amendments previously allowed . . . ."  *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001); *see also Foudy*, 845 F.3d at 1126.  Plaintiff has demonstrated both.  His bad-faith refusal to comply with the court's clear directives regarding amendment has shown a repeated failure to cure deficiencies.  Perdue asserts that "Plaintiff has thrice attempted, and failed, to state a cause of action against" it.  (Dkt. 132 at 16.)  Similarly, the Volusia Sheriff's Office Defendants maintain:

> [Plaintiff]'s repeated inability to provide the necessary factual framework for the [section] 1983 claims demonstrates their lack of merit. The [c]ourt's November 25, 2024 [o]rder thoroughly analyzed [his] . . . allegations[] and methodically described the deficiencies [he] was required to correct in the [second amended complaint]. [Plaintiff] was ordered to "eliminate from his second amended complaint all details unrelated to the claims that he asserts in the second amended complaint, and Plaintiff shall add details only as necessary to correct the pleading deficiencies identified in this order and otherwise state claims for relief." Instead of complying with this direction, [Plaintiff] has expounded only on irrelevant details while the facts concerning the constitutional claims largely remain the same. Despite multiple opportunities, [Plaintiff] has repeatedly failed to cure the deficiencies in his pleadings.

(Dkt. 134 at 2–3 (quoting Dkt. 126 at 41).) The court agrees with Defendants and thus dismisses the second amended complaint with prejudice. *See Kennedy v. Bell S. Telcomms., Inc. (AT&T),* 546 F. App'x 817, 820 (11th Cir. 2013) (affirming the dismissal with prejudice of a pro se second amended complaint when the "court repeatedly told [the plaintiff] how to comply with its pleading requirements" but the plaintiff "repeatedly ignored those instructions"); *Carvel v. Godley*, 404 F. App'x 359, 361 (11th Cir. 2010) (affirming same when the second amended complaint "continue[d] to suffer from the same deficiencies that the magistrate judge and the district court repeatedly advised [the pro se plaintiff] to correct").

### CONCLUSION

Accordingly:

1. Defendants' motions to dismiss (Dkts. 132, 134) are **GRANTED**.

2. Defendants' motions to stay (Dkts. 138, 140) are **DENIED as moot**.

3. The second amended complaint (Dkt. 130) is **DISMISSED with prejudice**.

4. The Clerk is **DIRECTED** to terminate any pending motions and deadlines and

to close this case.

**ORDERED** in Orlando, Florida, on June 3, 2025.

JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Unrepresented Parties
Counsel of Record